UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LYNDALE R. IVY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01751-SEB-TAB |
| | ) | |
| JOHN L. MERSHON Dr., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
RESOLVING PENDING MOTIONS,
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Lyndale Ivy is an Indiana Department of Correction ("IDOC") inmate housed at Pendleton Correctional Facility ("Pendleton"). In this action, Mr. Ivy alleges that Defendants violated his Eighth Amendment rights with respect to his hip and knee conditions. *See* dkts. 27, 40. Mr. Ivy proceeds on Eighth Amendment deliberate indifference claims against defendants Dr. Mershon, NP Osburn, Nurse Pryor, and HSA Hamblen, a *Monell* and claim against Centurion, and state law intentional infliction of emotional distress and medical malpractice or negligence claims against all defendants. Dkt. 27 at 4-5; dkt. 40 at 3.

Defendants moved for summary judgment. Dkt. 88. For the reasons explained below, Defendants' motion for summary judgment, dkt. [88], is **granted** and Mr. Ivy's motion for summary judgment, dkt. [98], is **denied.** Mr. Ivy's motion to impose sanctions on the Defendants, dkt. [104], is **denied**.

In addition, Mr. Ivy's motion to withdraw his second motion for preliminary injunction, dkt. [115] is **granted**. Mr. Ivy's requests for preliminary injunction, dkts. [80], [86] are **denied.**

1

His motion for the Court to rule on his preliminary injunction motions, dkt. [98], is **granted** consistent with this Order.

## I.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A.  The Parties and Background

Plaintiff Lyndale Ivy is an IDOC inmate incarcerated at Pendleton where the events that gave rise to this action took place. *See* dkt. 27. He was 66 years old when he filed his lawsuit in September 2023. Dkt. 2 at 4.

Defendant Lisa Hamblen is the Health Services Administrator ("HSA") at Pendleton. Dkt. 90-8 at 1-2. In this role, Ms. Hamblen does not make any medical treatment decisions regarding patients, and she is not involved in determining whether a patient needs to be seen by medical staff or outside providers. *Id*. Ms. Hamblen has a limited role in the grievance process; she responds to inquiries from the facility's grievance specialist by reviewing medical records and providing relevant information. *Id*.

Defendant John Mershon, M.D., is a licensed physician who works for Centurion at Pendleton. Dkt. 90-7 at 1-2.

Nurse Katherine Pryor is a registered nurse who works for Centurion at Pendleton. Dkt. 2 at 2. In her role as a nurse, she cannot diagnose medical conditions or prescribe medications or medical devices. Dkt. 90-7 at 5. A nurse's role is to provide supportive care within the scope of nursing practice, which includes assessing patient needs, monitoring symptoms, and carrying out provider ordered treatments. *Id*. When a patient's medical concerns require evaluation or treatment beyond nursing care, nursing staff refer the patient to a licensed provider for diagnosis and management. *Id*.

Defendant Nurse Practitioner Vernon Osburn is a licensed nurse practitioner who works for Centurion at Pendleton. Dkt. 2 at 2.

Centurion contracts with IDOC to administer health care to inmates at state facilities such as Pendleton. Dkt. 90-7 at 1-2.

### B. Outside Medical Experts

IDOC inmates sometimes visit outside medical experts, through an Offsite Provider Request ("OPR") that must be approved by Centurion staff. Dkt. 90-7 at 6; dkt. 90-1 at 34. These outside providers do not have any authority to order medical care or treatment for inmate patients. Dkt. 90-7 at 6. Their role is limited to providing medical opinions and recommendations to the facility medical providers, and performing medical procedures authorized by the facility's medical providers. *Id*. If outside medical care is needed, the order for such care must be made by facility medical staff. *Id*. This process ensures that any decision requiring transportation to an outside facility is made by individuals directly affiliated with the prison and responsible for both the inmate's care and institutional security. *Id*.

### C. Medical devices

Dr. Mershon states under oath that medical devices like canes, crutches, and wheelchairs must receive prior approval from the facility's security staff before issuance to an inmate because they present potential security risks within a correctional facility. Dkt. 90-7 at 6. Medical staff may evaluate an inmate and recommend a medical device, but facility officials retain the ultimate authority to determine if the device may be permitted inside the facility. *Id*.

Mr. Ivy alleges this is not true, and that prior authorization from correctional staff is not required to provide an inmate with medical devices like canes, crutches, and wheelchairs. Dkt. 99-1 at 2-3; dkt. 104 at 2-4. Mr. Ivy states he knows this because he was prescribed such devices on

4

three occasions and did not see Dr. Mershon to obtain prior approval, and because he has been an IDOC inmate for 47 years and is familiar with all IDOC policies and none state this requirement. Dkt. 99-1 at 2-3; dkt. 104 at 2-4.

### D. Osteoarthritis

Osteoarthritis is the most common form of arthritis, affecting millions of people worldwide. Mayo Clinic, *Osteoarthritis* https://www.mayoclinic.org/diseases-conditions/osteoarthritis/symptoms-causes/syc-20351925 (last visited Feb. 26, 2026). It occurs when the protective cartilage that cushions the ends of the bones wears down over time. *Id*.

Joint space narrowing is not a symptom that a patient experiences, nor is it a separate diagnosis. Dkt. 90-7 at 6. It is a radiographic finding observed on diagnostic imaging that reflects loss of cartilage within the joint. *Id*. Joint space narrowing is a hallmark indicator consistent with the diagnosis and progression of osteoarthritis. *Id*.

### E. Mr. Ivy's Related Medical History

#### 1. 2022

On December 8, 2022, Mr. Ivy had an X-ray of his right hip and right knee. The findings of his hip X-ray were:

> There is no acute bony fracture, or joint subluxation or dislocation seen. There is mild to moderate osteoarthritis of the hip joint marked by severe narrowing of the weightbearing aspect of the joint. There is no evidence for avascular necrosis. No soft tissue emphysema, radiodense soft tissue abnormality or foreign body is seen.

Dkt. 90-1 at 46-47. The findings of his knee X-ray were:

> There is no acute bony fracture, or joint subluxation or dislocation seen. No focal bone erosion or sclerosis is seen. No evidence for inflammatory or degenerative arthritis is seen. No suprapatellar soft tissue density reminiscent of a gross going effusion is seen. No soft tissue emphysema, radiodense soft tissue abnormality or foreign body is seen.

*Id*. at 48-49. The reports from the X-rays concluded that Mr. Ivy had mild to moderate osteoarthritis in his hip, and no arthritis in his knee. *Id*. at 46-49; dkt. 90-7 at 7.

On December 29, 2022, Mr. Ivy was evaluated by NP Osburn in response to a health care request he had submitted two days earlier. Dkt. 2 at 7-8. NP Osburn reviewed Mr. Ivy's medical records and the X-ray results and informed him that he was diagnosed with moderate arthritis in his right hip and knee. *Id*. NP Osburn prescribed Meloxicam and increased Mr. Ivy's Tylenol to two 500 mg tablets once a day. *Id*. Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve the symptoms of arthritis (juvenile rheumatoid arthritis, osteoarthritis, and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain. Mayo Clinic, *Meloxicam (oral route)*, https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited Feb. 26, 2026).

### 2. 2023

Mr. Ivy submitted health care request forms on April 21 and 25, 2023, for his hip and knee pain, and requesting medical treatment after the X-ray results. Dkt. 90-1 at 11-12. The response from health care staff was that he was currently on Meloxicam and would be referred to a provider. *Id*.

On April 25, Mr. Ivy submitted grievance 23-147068 requesting medical treatment for his hip. Dkt. 90-2.

On May 1, Mr. Ivy had a medical visit with Dr. John Mershon for his hip pain. Dkt. 90-1 at 13-15. Dr. Mershon noted that Mr. Ivy walked with a limp and had decreased range of motion in his right hip. *Id*. Dr. Mershon's treatment plan indicated that Mr. Ivy would be a good candidate for a steroid injection in his hip as the next step, and that physical therapy may be helpful after the steroid shot. *Id*. Mr. Ivy was still taking Meloxicam for pain. *Id*.

6

On May 15, Mr. Ivy submitted a health care request form reporting continued pain in his hip and requesting the steroid injection. Dkt. 90-1 at 10. Mr. Ivy was seen three days later by Dr. Mershon. *Id*. at 16-18. Dr. Mershon referred Mr. Ivy to an orthopedic specialist for further evaluation and consideration of a steroid injection in the hip, provided him with a wheelchair, changed his pain medication to Extra Strength Tylenol, and planned to follow up after the orthopedic consultation. *Id*. at 16-18.

The same day after his visit, Mr. Ivy submitted grievance 23-147070, requesting that he be sent to an orthopedist immediately as opposed to waiting for approval and a scheduled appointment. Dkt. 90-3.

On May 24, Centurion personnel approved the OPR submitted by Dr. Mershon for Mr. Ivy to be seen by an orthopedic specialist for his hip condition and to receive a hip steroid infection. Dkt. 90-1 at 34.

On June 19, Mr. Ivy submitted a healthcare request seeking a refill of Meloxicam. Dkt. 90-1 at 9. Dr. Mershon responded with a note that Meloxicam is not a good long-term medication for older men, and that he wrote a prescription for Tylenol, which is much safer. *Id*.

On June 21, Mr. Ivy received the responses to his two grievances. Dkt. 90-2 at 7; dkt. 90-3 at 7. HSA Hamblen responded to grievance 23-147068 stating, "Seen by provider on 5-18-23, Referred to ortho for consideration for pain injection and also referred to TP or evaluation. Tylenol ordered for pain and Mobic stopped. WC ordered for distances. Provider to follow up after other consult." Dkt. 90-2 at 7. The grievance noted that there was no other relief that could be offered. *Id*. The response to grievance 23-147070 from Dr. Marsden stated, "He's been approved to go to see orthopedic surgery. There's nothing we can do to speed that up!" Dkt. 90-3 at 7. Mr. Ivy appealed the grievances. Dkt. 90-2 at 5-6; dkt. 90-3 at 5-6.

On July 3, Mr. Ivy submitted another health care request form complaining of knee pain and requesting a different medication than Tylenol. Dkt. 90-1 at 8. The response from medical staff was that he was scheduled to be seen by outside orthopedics and the provider will follow up after the appointment. *Id*.

On July 6, Mr. Ivy submitted grievance 23-148837, requesting that he be sent to an orthopedist immediately for his hip instead of waiting for his appointment. Dkt. 90-4 at 6. HSA Hamblen responded to this grievance stating, "Appt was scheduled as soon as it could have been. Medical cannot control the schedules of offsite providers." *Id*. at 5. Mr. Ivy appealed this grievance. *Id*. at 1-4.

On July 24, Mr. Ivy submitted grievance 25-158421, complaining that his arthritis pain in his knee was not being effectively treated and he did not want to wait for the outside orthopedist appointment. Dkt. 90-5 at 2. HSA Hamblen responded, "Provider is not able to determine next steps until off site eval occurs. Pt will be scheduled with provider once off site consult has occurred." *Id*. at 1.

On August 7, Mr. Ivy had his visit with by Dr. Aaron Watters at Eskenazi Orthopedics, who evaluated him and agreed with Dr. Mershon's findings and plan and gave Mr. Ivy a right hip steroid injection. Dkt. 90-1 at 35-39.

On August 22 and September 2, Mr. Ivy submitted a health care request regarding his right knee pain and requesting to be seen by the provider after his steroid injection. *Id*. at 6-7.

Dr. Mershon states under oath that based on Mr. Ivy's December 2022 diagnostic imaging demonstrating mild to moderate osteoarthritis in the hip and no evidence of inflammatory or degenerative arthritis in the knee, it was medically appropriate to address his hip condition before considering any treatment directed to his knee. Dkt. 90-7 at 7. He also states under oath that it was

medically appropriate to allow time following the steroid injection to the hip to determine whether the knee symptoms would resolve on their own, as such symptoms can improve once the hip condition is managed. *Id*.

Mr. Ivy filed this lawsuit on September 28, 2023. Dkt. 2.

Mr. Ivy submitted another health care request on October 22, 2023, and was seen by a non-defendant Nurse Practitioner Sinikweyinkosi on October 25. He was prescribed physical therapy, a knee brace, Tylenol, Miloxacin, Diclofenac gel, and new X-rays of his knees and spine were ordered. Dkt. 90-1 at 5, 19-20.

Mr. Ivy submitted a health care request on November 13 and was seen by Dr. Mershon on November 22 for his knee pain. Dkt. 90-1 at 3, 21-22. Dr. Mershon noted that "His gait is normal but he struggled to walk up a few steps. The right knee has normal ROM, no swelling, erythema. Tender laterally. No laxity." *Id*. at 21.  Dr Merson gave him a trial of Prednisone in addition to checking on the ordered X-rays and the physical therapy that was already ordered. *Id*. at 22.

On December 2, Mr. Ivy submitted a health care request requesting a refill for Voltaren (Diclofenac), and the response indicated that he was scheduled to see a provider on December 5. *Id*. at 4. On December 5, an OPR was requested for a second steroid injection for Mr. Ivy's hip. Dkt. *Id*. at 23-24. Mr. Ivy submitted a grievance 24-169520 on December 7, requesting that he be taken to see the orthopedist for his second injection. Dkt. 90-6. The OPR approved by Centurion on December 15. Dkt. 90-1 at 40. Mr. Ivy received this injection on January 16, 2024. *Id*. at 41-45.

### 3.  2024 - 2025

On January 20, 2024, Mr. Ivy was seen for a physical therapy evaluation. *Id*. at 26-29. The therapist's plan was to implement progressive right lower extremity strengthening. *Id*. at 26-29.

On January 31, Mr. Ivy was seen by NP Sinikweyinkosi for his knee pain, and the provider indicated that he was requesting another steroid shot for his knee. *Id.* at 30-32.

Mr. Ivy received the response to his grievance 24-169520 on January 31, which included a statement from HSA Hamblen, "There is no order for an injection of any kind. Pt was seen offsite by ortho on 1-16-24." Dkt. 90-6 at 5. Mr. Ivy appealed this response and argued that when he saw the offsite orthopedist to get his first injection on August 1, 2023, that he provided a follow-up recommendation to return in 3-4 months. *Id.* at 3-4. Mr. Ivy stated that HSA Hamblen's statement was false and inaccurate. *Id.* at 3.

Mr. Ivy received a third steroid injection in his hip on April 18, 2024, and one in his knee on May 3. *Id.* at 50-53. Mr. Ivy was provided with a cane on October 24, 2024. *Id.* at 82. Mr. Ivy received steroid injections in his hip on December 26, 2024, and March 26, 2025. *Id.* at 83, 67-68.

Mr. Ivy was seen by Dr. Nwannunu on March 17, 2025, and the plan was to continue scheduling steroid injections. *Id.* at 64-66. He continued to be seen by medical providers regarding his arthritis on April 9 and May 13, 2025. *Id.* at 69-75. On May 31, 2025, Mr. Ivy had a physical therapy evaluation where exercises were taught, and a stretch band was provided. *Id.* at 76-80. Mr. Ivy continues to receive pain medication refills for the various pain medications he has been prescribed. *Id.* at 54-63.

### III.
### Discussion

Mr. Ivy proceeds on Eighth Amendment deliberate indifference claims against the individual defendants, a *Monell* claim against Centurion, and state law intentional infliction of emotional distress and medical malpractice or negligence claims against all defendants. Dkt. 27 at 4-5; dkt. 40 at 3.

## A. Deliberate Indifference to Medical Need

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

The Court assumes for purposes of the summary judgment motion that Mr. Ivy's osteoarthritis in his hip and knee pain was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that Dr. Mershon, NP Osburn, Nurse Pryor, and HSA Hamblen acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Ivy's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Ivy "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

### 1. NP Osburn

Mr. Ivy's claims against NP Osburn stem from one December 2022 visit, in which Mr. Ivy alleges that Nurse Osburn was deliberately indifferent to his arthritis condition. Dkt. 99 at 10. Mr. Ivy has not designated any evidence from which a reasonable jury could infer that NP Osburn's treatment was "so far afield of accepted professional standards that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (cleaned up). NP Osburn met with Mr. Ivy two days after he submitted a health care request form. NP Osburn reviewed Mr. Ivy's medical records and the radiologist's findings from his recent x-ray, prescribed Meloxicam, and increased Mr. Ivy's Tylenol dosage. Deliberate indifference requires "something more than negligence or even malpractice." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 679 (7th Cir. 2023). Here, the undisputed facts show that NP Osburn took affirmative steps to address Mr. Ivy's medical concerns.

While Mr. Ivy wanted NP Osburn to provide him with specific care during and after the visit (an offsite referral for a steroid injection), it is fundamental that prisoners are not entitled to demand specific care from their medical providers. *Walker v. Wexford Health Sources*, 940 F.3d

954, 965 (7th Cir. 2019). Mr. Ivy focuses on the diagnostic finding that his joint space narrowing was "severe," but the radiologist report that NP Osburn reasonably relied upon concluded that his hip arthritis was mild to moderate. NP Osburn's response to provide pain medication and explain his diagnosis did not demonstrate a conscious disregard of Mr. Ivy's health. Accordingly, NP Osburn is entitled to summary judgment in his favor

### 2. Nurse Pryor and HSA Hamblen

Mr. Ivy alleges that Nurse Pryor and HSA Hamblen ignored his pain and caused delay in his treatment by not appropriately scheduling his medical appointments. Specifically, Mr. Ivy's claim against Nurse Pryor is premised on (1) her response to his July 3, 2023 request for health care, and that she failed to schedule a follow up appointment after he returned from the offsite specialist in August 2023; (2) an April 26, 2023 conversation with Nurse Pryor in which he asked her for help to get a cane or crutches for his mobility, and she said she could not help him; and (3) her response to his November 13, 2023 health care request. Dkt. 99 at 10-12, 23-25.

Mr. Ivy's claim against HSA Hamblen is also premised on this November 13, 2023, health care request and a follow up conversation. Mr. Ivy also argues that on November 13, he submitted a health care request to Nurse Pryor that was addressed to HSA Hamblen, asking to be scheduled for a follow-up injection with the offsite specialist, as the offsite specialist had recommended that he return in 3-4 months. In response, HSA Hamblen and Nurse Pryor scheduled him to see a provider in the facility to re-examine him to determine if he needed to have the offsite visit. Mr. Ivy alleges that this caused a delay in his care, and that HSA Hamblen's response on January 31, 2024, in a grievance that no follow up appointment was scheduled (after he received his second injection on January 16) was false.

It is undisputed that nurses and health services administrators cannot prescribe medication or prescribe mobility devices such as crutches or a wheelchair. The record demonstrates that Nurse Pryor and HSA Hamblen acted within the scope of their role, never physically examined Mr. Ivy for treatment, and responded to each of Mr. Ivy's requests. Mr. Ivy requested crutches or a mobility device from Nurse Pryor in April 2023, but she did not have the ability to prescribe such device. On these facts, no jury could conclude that Nurse Pryor was deliberately indifferent for not immediately giving him the specific care that he requested.

As to Nurse Pryor's response to the July 3, 2023, request for health care, the record demonstrates that Nurse Pryor received his health care requests, reviewed Mr. Ivy's medical record, consulted with the physician, and responded appropriately by stating, "offender to be seen by outside ortho- provider will follow up after appt. Dkt. 90-1 at 8. At the time, Mr. Ivy's current treatment plan was to see an outside specialist for a steroid injection and then see a physician for follow up. Mr. Ivy was informed on July 6 in response to his grievances that this appointment was scheduled as soon as it could have been, and that the facility medical team cannot control the schedules of the offsite providers. Mr. Ivy was informed in another grievance response that the provider was unable to determine next steps until the offsite evaluation occurred. This visit did occur on August 7, in which he received a steroid injection. No reasonable jury could conclude that Nurse Pryor was deliberately indifferent in responding to the July 3 health care request form.

After Mr. Ivy returned from receiving the steroid injection, he requested to be seen by a provider on August 22 and September 2, 2023, in health care request forms. It is not clear who reviewed and processed these request forms, but the response to the first is "needs follow up with provider-outside appt 2 wks ago," and the next response is "provider." Dkt. 90-1 at 6-7. There is no evidence in the record that these responses were from Nurse Pryor, but if they were, they evince

that she referred the requests to the provider. It is Dr. Mershon's testimony that he believed it medically appropriate to allow time following the hip steroid injection to see if Mr. Ivy's symptoms would improve or resolve. When Mr. Ivy requested a health care visit on October 22, 2023, he was seen two days later. No reasonable jury could conclude that Nurse Pryor was deliberately indifferent in referring Mr. Ivy's health care requests to a provider for review and following the provider's treatment plan.

Finally, with respect Nurse Pryor's and HSA Hamblen's response to the November 2023 request to see an outside provider, no reasonable jury could conclude that they acted with deliberate indifference. Mr. Ivy wanted them to immediately schedule him for another steroid injection with an outside provider, but Dr. Mershon's unrefuted testimony establishes that, even if Mr. Ivy's offsite visit recommended follow up in 3-4 months from the initial shot, an offsite provider can only recommend treatment, but the facility medical staff must review and request the offsite treatment. The record reveals that Nurse Pryor and HSA Hamblen acted appropriately in not immediately scheduling Mr. Ivy for another injection. Instead, the record reveals that Mr. Ivy was seen on November 22 and December 5 by providers at the facility who assessed his pain. Mr. Ivy's medical records also reveal that he was medically assessed, the offsite second injection was ordered, and he received it on January 16, 2024. On these facts, no reasonable jury could conclude that Nurse Pryor and HSA Hamblen unreasonably delayed his next injection. Outside prison walls, people requiring treatment from medical specialists often must wait in pain, sickness, and anxiety for openings in jam-packed calendars. That Mr. Ivy experienced the same ordeal inside prison does not entitle him to damages from the Defendants or mean that they violated the Constitution.

Accordingly, HSA Hamblen and Nurse Pryor are entitled to summary judgment in their favor.

### 3. Dr. Mershon

Dr. Mershon is entitled to summary judgment because he provided adequate medical care based on his professional judgment. Mr. Ivy has not designated any evidence from which a reasonable jury could infer that his course of treatment was "so far afield of accepted professional standards that a jury could find it was not the product of medical judgment." *Cesal*, 851 F.3d at 724. Instead, Mr. Ivy shares his dissatisfaction with Dr. Mershon's treatment decisions. But disagreement with a physician's chosen course of medical treatment alone is insufficient to establish a claim of deliberate indifference. *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021). Mr. Ivy argues that his medical records demonstrate that he needs hip replacement surgery ("THA"), but the cited record only provides that Mr. Ivy reported he "knows he needs a THA" in his physical therapy evaluation. Dkt. 90-1 at 76. Stated differently, Mr. Ivy demands specific care: to receive hip replacement surgery. It is fundamental that prisoners are not entitled to demand specific care from their medical providers. *Walker v. Wexford Health Sources*, 940 F.3d 954, 965 (7th Cir. 2019).

Mr. Ivy also argues that Dr. Mershon was deliberately indifferent by failing to supply him with a mobility device after the December 2022 X-ray, until he ordered a wheelchair on May 18, 2023. However, Mr. Ivy's medical records demonstrate that Dr. Mershon created a treatment plan, which included offsite steroid injections, pain medication, and physical therapy. As Mr. Ivy states, there is no cure to osteoarthritis. Dkt. 99 at 4. While Dr. Mershon himself did not meet with Mr. Ivy after the December 2022 X-ray, or every time he submitted a health care request, the fact that Mr. Ivy was seen by another healthcare provider does not evince deliberate indifference by Dr. Mershon. There is no evidence that Dr. Mershon was Mr. Ivy's sole provider. In fact, the record demonstrates that Mr. Ivy had a team of medical professionals meeting with him. NP Osburn met

with Mr. Ivy two days after he requested medical attention after the December 2022 X-ray. When Mr. Ivy next requested medical attention for his osteoarthritis symptoms on April 21 and 25, 2023, Dr. Mershon met with him on May 1.

Mr. Ivy's medical records are absent of any instance where he requested medical assistance and was denied it by Dr. Mershon. Instead, the record demonstrates that he was treated with pain medication, temporary mobility devices, and offsite steroid injections. Dr. Mershon changed Mr. Ivy's medication, and increased dosages, when he continued to report experiencing pain. While Mr. Ivy disagrees with Dr. Mershon's decision to discontinue Meloxicam and prescribe Extra Strength Tylenol, Dr. Mershon did so because he believed Meloxicam to be harmful long term, in an exercise of his professional judgment.

The undisputed evidence reveals that Dr. Mershon submitted requests for Mr. Ivy to be seen by an outside orthopedic specialist. No record evidence suggests that Dr. Mershon, or any of the facility medical staff, had control over when the offsite visit was scheduled. Thus, they cannot be held liable for any delay with respect to scheduling the outside provider appointments. While Mr. Ivy argues he should have been seen immediately after returning from his first offsite visit and steroid injection, Dr. Mershon decided it was medically appropriate to allow time following the injection to determine if his symptoms would resolve. Two months after the injection, Mr. Ivy was prescribed physical therapy, a knee brace, new medication, and new X-rays were ordered.

Given the totality of Dr. Mershon's treatment of Mr. Ivy, no reasonable jury could conclude that his actions evinced deliberate indifference. Accordingly, Dr. Mershon is entitled to summary judgment in his favor on Mr. Ivy's claims that they were deliberately indifferent to his osteoarthritis in his hip and knee pain.

### B. Policy, Practice or Custom claim against Centurion

In order to maintain a § 1983 claim against Centurion, the plaintiff must show that Mr. Ivy's constitutional rights were violated by a policy or custom of Centurion. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, Mr. Ivy must first show that he was deprived of a federal right, and then that the deprivation was caused by a Centurion custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Further, to the extent that the plaintiff is challenging a facially lawful policy (express or implied), the plaintiff must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). If challenging an unconstitutional municipal practice or custom, the plaintiff must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

Mr. Ivy fails on the first prong. As previously established, he has not proved that he was deprived of a federal right when he was denied the specific healthcare treatment he demanded. Accordingly, summary judgment must be granted for Centurion.

### C. State-law claims

With Mr. Ivy's constitutional claims staged for dismissal, the Court has discretion whether to exercise supplemental jurisdiction over his remaining state-law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also*

*Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). "Indeed, when the federal claims are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added).

When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and quoted authority omitted).

In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and quoted authority omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation marks and quoted authority).

No circumstance in this case overcomes the presumption that the Court should relinquish jurisdiction over Mr. Ivy's state-law claims. The statute of limitations is not a factor. Both federal

and state law toll the relevant limitation period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998).

The Court has not expended significant resources on the pending state-law claims. The Court does not expect that the parties' discovery and briefing efforts with respect to the state law claims will go to waste. Rather, the evidence and legal research they have uncovered should be every bit as relevant in a state-court proceeding.

Further, it is not absolutely clear how the state-law claims should be resolved. The outcome of Mr. Ivy's medical malpractice, negligence, and intentional infliction of emotional distress claims is not so obvious as to weigh in favor of the federal court retaining jurisdiction. Finally, comity always favors allowing state courts to decide issues of state law. Having resolved all claims within its original jurisdiction, the Court exercises its discretion and relinquishes supplemental jurisdiction over Mr. Ivy's state law negligence claim.

## IV.
## Motions for Preliminary Injunction

Mr. Ivy has filed two motions for preliminary injunction in this matter, and a motion to withdraw his second preliminary injunction motion. Dkt. 115. This motion to withdraw, dkt. [115], is **granted**. Mr. Ivy's requests for preliminary injunction, dkts. [80], [86] are **denied.** His motion for the Court to rule on his preliminary injunction motions, dkt. [98], is **granted** consistent with this Order.

To obtain preliminary injunctive relief, Mr. Ivy must establish that (1) he will suffer irreparable harm; (2) his traditional legal remedies are inadequate; and (3) he has some likelihood of success on the merits. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

Because Mr. Ivy has not shown success on the merits, his various requests for injunctive relief must be denied. The Court also concluded that the Defendants were not deliberately indifferent and are therefore entitled to summary judgment as to the claims against them. Accordingly, Mr. Ivy has not met his burden as to warrant any injunctive relief. For those reasons, Mr. Ivy's requests for injunctive relief are therefore **denied**.

## V.
## Cross- Motion for Summary Judgement

Although Mr. Ivy did not cross-move for summary judgment, he "nonetheless respectfully asks the Court to treat his Response as a cross-motion for summary judgment in his favor." Dkt. 99 at 28. The deadline to file dispositive motions was September 2, 2025. Dkt. 54. Mr. Ivy did not seek leave to file an untimely motion for summary judgment. Any request to treat his response as a cross-motion is **denied**.

## VI.
## Motions for Sanctions

Mr. Ivy has filed a motion to impose sanctions on Dr. Mershon and his attorney. Dkt. 104. Specifically, Mr. Ivy argues that Dr. Mershon has submitted a false statement in a declaration to the Court. Mr. Ivy argues that one paragraph of Dr. Mershon's affidavit testimony is false. This paragraph states:

> Medical devices such as canes, crutches, and wheelchairs present potential security risks within correctional facilities. While medical staff may evaluate an inmate and recommend a medical device when clinically appropriate, prison officials retain the ultimate authority to determine whether any such device may be permitted inside the facility. All medical devices must therefore receive prior approval from prison security staff before issuance to an inmate.

Dkt. 90-7, ¶ 31. Mr. Ivy argues he knows this is incorrect because he saw Dr. Mershon prescribe him a cane and wheelchair on separate occasions and Mr. Ivy did not see him seek prior approval from prison officials. Mr. Ivy further argues that he has been in IDOC custody for 47 years and

does not know of any such IDOC policy. Mr. Ivy brings his motion "pursuant only to the Court's inherent authority" and requests that Dr. Mershon and his counsel be sanctioned, and that he be granted default judgment. Dkt. 104 at 9.

Defendants responded and included an affidavit from Dr. Mershon. Dkt. 109. Dr. Mershon explains that the Warden holds ultimate authority over what items are permitted or prohibited within the facility, and he may delegate day-to-day approval functions to staff, he maintains ultimate decision-making authority and oversight. Dkt. 109-1 at 2-3. Some common medical devices like canes, crutches, splints, and medical wraps have been pre-authorized by facility administration for issuance directly by medical personnel when ordered. *Id*. at 3. However, the issuance of these devices remains subject to review and approval by correctional staff in the housing units. *Id*. Wheelchairs are not pre-approved due to their size, construction, and potential security implications, and any request or order for a wheelchair requires individual review and authorization. *Id*. Medical staff may issue a wheelchair pass for long distances, where the wheelchair is not issued to the patient for their permanent use. *Id*.

To impose sanctions under the Court's inherent authority, it "must find that the party to be sanctioned willfully abused the judicial process or otherwise conducted litigation in bad faith." *Vega v. Chicago v. Bd. of Ed.*, 109 F.4th 948, 956 (7th Cir. 2024) (cleaned up). Specifically, before invoking its inherent sanctions authority, the Court "must first make a finding that the sanctioned party engaged in bad faith to obstruct the judicial process or bring about the violation of a court order." *Id.* Any sanctions imposed "must be proportionate to the circumstances." *Donelson v. Hardy*, 931 F.3d 565, 569 (7th Cir. 2019). Factors relevant to proportionality include "the extent of the misconduct, the ineffectiveness of lesser sanctions, the harm from the misconduct, and the weakness of the case." *Id.* A court may enter a default judgment for discovery violations under its

inherent authority, but only if it finds that the responsible party acted or failed to act with a degree of culpability that exceeds simple inadvertence or mistake. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016). Facts supporting sanctions must be proved by a preponderance of the evidence. *Id.* at 781.

The Court has reviewed the briefing and the parties' arguments and finds no evidence of bad faith by Defendant. While Mr. Ivy disagrees with the one paragraph included by Dr. Mershon in his affidavit, much of Mr. Ivy's disagreements amounts to small disagreements about the precise words used by Dr. Mershon and do not show bad faith on the part of counsel or Dr. Mershon. Dr. Mershon provided a more detailed affidavit in response that explains and clarifies his earlier language. As the Court previously informed Mr. Ivy: "Parties often disagree about issues and facts, and the Court sides with one party over another. This does not amount to bad faith or willful abuse of the judicial process." Dkt. 114 at 4.  Defendants' counsel's briefing of the summary judgment motion falls within the range of reasonable advocacy and does not support a finding of bad faith or willful abuse of the judicial process that warrants sanctions, let alone the harsh sanction of a default judgment. Accordingly, Mr. Ivy's motion to impose sanctions, dkt. [104], is **denied**.

## VII.
## Conclusion

Defendants' motion for summary judgment, dkt. [88], is **granted**. Having resolved all claims within its original jurisdiction, the Court exercises its discretion and relinquishes supplemental jurisdiction over Mr. Ivy's state law negligence claim.

Mr. Ivy's motion to withdraw his second motion for preliminary injunction, dkt. [115] is **granted**. Mr. Ivy's requests for preliminary injunction, dkts. [80], [86] are **denied.** His motion for the Court to rule on his preliminary injunction motions, dkt. [98], is **granted** consistent with this Order. Mr. Ivy's motion to impose sanctions on the Defendants, dkt. [104], is **denied**.

Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date:   3/2/2026

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

LYNDALE R. IVY
5087
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Joshua R Taylor
Bleeke Dillon Crandall
joshua@bleekedilloncrandall.com